monitoring. However, when the court sentenced Brooks to probation, it was also required by § 60-6,197.03(6) to impose a $1,000 fine, and it failed to do so.

[11] A sentence is illegal when it is not authorized by the judgment of conviction or when it is greater or less than the permissible statutory penalty for the crime. *State v. Alba*, 13 Neb. App. 519, 697 N.W.2d 295 (2005).

[12] Inasmuch as this court has the power on direct appeal to remand a cause for the imposition of a lawful sentence where an erroneous one is pronounced, see *State v. Conover*, 270 Neb. 446, 703 N.W.2d 898 (2005), we vacate the sentence imposed for third-offense refusal to submit to a chemical test and remand the matter for imposition of the sentence required by law.

## CONCLUSION

We reject Brooks' claim that mitigating facts brought to the attention of the court by a defendant pursuant to § 60-6,197.02(3) are used by the district court in determining whether an otherwise valid prior offense should be used for the purpose of enhancement. Therefore, we affirm his conviction. However, because we find that the court imposed an illegal sentence by failing to impose a statutorily required fine, we vacate Brooks' sentence and remand the matter for imposition of the sentence required by law.

AFFIRMED IN PART, AND IN PART VACATED
AND REMANDED FOR RESENTENCING.

---

AARON E. ROMMERS, APPELLANT, V.
ELIZABETH S. ROMMERS, APPELLEE.
___ N.W.2d ___

Filed December 16, 2014.    No. A-14-119.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these

determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.

2. **Visitation: Appeal and Error.** Parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

3. **Child Support: Taxation: Appeal and Error.** An award of a dependency exemption is reviewed de novo to determine whether the trial court abused its discretion.

4. **Judges: Words and Phrases.** A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

5. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

6. **Child Custody.** The standard for determining custody is parental fitness and the child's best interests.

7. ____. In determining the best interests of the child in a custody determination, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the desires and wishes of the minor child if of an age of comprehension regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the general health, welfare, and social behavior of the minor child; and (4) credible evidence of abuse inflicted on any family or household member. Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy educational needs of the child.

8. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

9. **Child Custody.** The custodial parent must satisfy the court that there is a legitimate reason for leaving the state and that it is in the minor child's best interests to continue to live with that parent.

10. **Child Custody: Visitation.** There are three broad considerations to consider whether removal from the state is in the children's best interests: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the children and the custodial parent; and (3) the impact such a move will have on the contact between the children and the noncustodial parent, when viewed in the light of reasonable visitation.

11. ____: ____. The purpose of requiring a legitimate reason for removing children from the state is to prevent the custodial parent from relocating because of an ulterior motive, such as frustrating the noncustodial parent's visitation rights.

12.  ____: ____. A reasonable visitation arrangement should provide a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent.

Appeal from the District Court for Holt County: MARK D. KOZISEK, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Joel E. Carlson, of Stratton, DeLay, Doele, Carlson & Buettner, P.C., L.L.O., for appellant.

Lori McClain Lee, of Legal Aid of Nebraska, for appellee.

INBODY, RIEDMANN, and BISHOP, Judges.

INBODY, Judge.

## INTRODUCTION

Aaron E. Rommers appeals the order of the Holt County District Court dissolving his marriage to Elizabeth S. Rommers and awarding her custody of the parties' minor child in Arizona. For the reasons that follow, we affirm in part, and in part reverse and remand the matter back to the district court for further proceedings.

## STATEMENT OF FACTS

Aaron and Elizabeth were married in February 2010. Of that marriage, one minor child, Samantha Rommers, was born in June 2012. On January 2, 2013, Aaron filed a complaint for dissolution asserting that the marriage between himself and Elizabeth was over and that both parties were fit and proper to have custody of Samantha. The complaint further asserted that Elizabeth and Samantha had been living in Arizona since December 4, 2012. The complaint requested that the court dissolve the parties' marriage, divide the property and debts, and award the parties joint physical and legal custody of Samantha.

Elizabeth filed an answer and counterclaim alleging that an ongoing custody case had been filed on December 7, 2012, in the Superior Court of Pinal County, Arizona, in which Elizabeth had been granted temporary emergency custody of Samantha. Elizabeth's counterclaim requested that the court

dissolve the parties' marriage, divide the property and debts, and award Elizabeth custody and child support. The proceedings initiated in Arizona were later dismissed, and all further proceedings were held in Nebraska.

At trial in December 2013, various family members for both parties testified. Aaron testified that he married Elizabeth in 2010 and that he, Elizabeth, and Samantha lived in the same home where he still resides in Ewing, Nebraska. Aaron testified that he has lived in Ewing his entire life and that he has a large family which also lives in the area. Aaron testified that he had family and community support and wanted to have Samantha in his life.

Aaron testified that during the marriage, he shared parental responsibilities with Elizabeth and would help out whenever he could with both Samantha and household duties such as cooking and cleaning. Aaron was employed full time and has continued to maintain that employment throughout the proceedings, earning $17.84 per hour.

Aaron testified that Elizabeth left the family home with Samantha on December 3, 2012. Aaron explained that Elizabeth did not return any of his text messages that day and that when he arrived home from work, she and Samantha were gone. Aaron learned that Elizabeth was in Arizona when he saw that she had used a debit card from his checking account in that area. Sometime thereafter, Aaron spoke with Elizabeth, who indicated that she and Samantha would not be returning to Nebraska. Aaron testified that the distance from his home to where Elizabeth and Samantha reside in Arizona is 1,400 miles one way. Aaron testified that he attempted to make arrangements with Elizabeth to see Samantha, but that Elizabeth refused until June 2013, when she gave him permission to make a trip to Arizona before Samantha's first birthday. On June 17, Aaron made the 24-hour car trip to Arizona, where he spent four nights. Elizabeth did not allow Aaron to see Samantha on the first day he was in Arizona, but did allow about 3 hours per day thereafter, broken into two times per day. Aaron testified that either Elizabeth, her brother, or her sister-in-law was present at all of the visits. Aaron testified that the total expenses for the trip equated to $1,200 and

that making that trip again would be very financially difficult for him. Aaron testified that he has not made any further trips to Arizona, but had recently begun to have "Skype visit[s]" with Samantha over the Internet.

Aaron testified that initially, when Elizabeth left him, he attempted to support her by putting money in his checking account for her to access, but was unable to continually provide that type of support because he had been sued on several debts and had his wages garnished.

Aaron testified that he believed Elizabeth left him because she was upset by a picture and e-mail he received of another woman, but that he did not have any Internet communications with other women. Aaron testified that he had been frustrated at times when Samantha was an infant because she was colicky and it was difficult for both him and Elizabeth to soothe Samantha, but that he had not lost his patience with her. He refuted Elizabeth's accusations that he had lashed out against property in moments of frustration.

Aaron's aunt testified that she had observed Aaron with Samantha in the months after her birth and that he positively interacted with Samantha and was a proud father. Aaron's aunt had not seen Samantha since September 2012.

Aaron's mother, Laura Rommers, testified that Aaron owns his own home, which was approximately four blocks from her home, and that it is a two-bedroom, one-bathroom home where he had lived with Elizabeth and Samantha during the marriage. Laura testified that Aaron took care of Samantha and shared parental and household responsibilities with Elizabeth. Laura testified that Elizabeth breastfed Samantha and that there were not many occasions when Aaron could feed Samantha. Laura also observed him changing diapers and bathing Samantha. Laura testified that after Samantha was born, Aaron worked full time and Elizabeth became a stay-at-home mother. Laura testified that in December 2012, Elizabeth took Samantha with her to Arizona and did not return to Nebraska, and that since that time, Aaron has been sad and more quiet than normal. Laura testified that Aaron has a large family and support in the area and that Aaron should have custody of Samantha

because he loves Samantha and would do everything he could for her.

Elizabeth testified that she grew up in an Amish community and met Aaron on a "Farmers Only" Web site "chat room." Elizabeth testified that she has 10 siblings, none of whom live in Nebraska. In September 2009, Elizabeth moved to Nebraska to live with Aaron and worked full time as a manager at a grocery store, earning $8 per hour, until shortly before giving birth to Samantha. Elizabeth did not return to any type of employment until moving to Arizona.

After Samantha's birth, Elizabeth stayed at home as the primary caregiver and Aaron worked a full-time job. Elizabeth testified that Aaron did not assist her with Samantha and became easily frustrated because of Samantha's colic, often yelling at Samantha to shut up. Elizabeth testified that on one occasion, Aaron became so frustrated he punched a dent into a wall and said he was done being a father. Elizabeth described Aaron as often aggressive and destructive of property in frustration. Elizabeth testified that Aaron spent "quite a bit of time" at home on the computer and that she was worried about leaving him alone with Samantha.

Elizabeth testified that she observed conversations that Aaron had with other women through e-mail and pictures on social media Web sites. Elizabeth believed that the conversations were inappropriate because she believed they were with younger women, but she did not know the ages of any of the women he had engaged with during online conversations. Elizabeth submitted evidence of one such conversation with Aaron's ex-girlfriend's sister, who Elizabeth testified was 12 or 13 years old, which involved an inappropriate picture of the girl. Elizabeth explained that she asked Aaron to stop communicating with other women, but that when he did not, she decided to leave.

Elizabeth left for Arizona on December 3, 2012, and she testified that she left Aaron a note and her wedding ring, but did not actually speak with him until the following day. Elizabeth testified that since moving to Arizona, she has lived with her brother and his wife, along with their six children,

who range in age from 7 to 15. The home has four bedrooms and three bathrooms, and Elizabeth and Samantha share a bedroom and bathroom. Elizabeth pays her brother $100 per month for both rent and childcare. Elizabeth testified that this residential situation is only temporary and that she hopes to be able to get her own place in the future. Elizabeth is employed as a cashier at a truckstop, earning $8.50 per hour and working approximately 30 hours a week. While Elizabeth works, her sister-in-law cares for Samantha, who gets along very well with her cousins.

Elizabeth testified that she has never refused Aaron visitation with Samantha if he was willing to travel to Arizona, but explained that she could not travel because she does not have a vehicle. Elizabeth testified that she has had frequent contact with Aaron and had also allowed Aaron visitation with Samantha during the time she and Samantha were in Nebraska for the trial proceedings. Elizabeth explained that she wanted supervised visitations between Aaron and Samantha because she was concerned with his temper and outbursts.

On December 30, 2013, the district court entered an order dissolving the parties' marriage. The court divided the parties' assets and debts, ordered no alimony, and ordered each party to pay his or her own costs and attorney fees. The court found that Elizabeth had moved to Arizona with Samantha before any proceedings were initiated in Nebraska, but determined that since there had been no previous custody determination, the court was not required to engage in a removal analysis under *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), insomuch as Elizabeth was not required to prove that she had a legitimate reason for leaving the state. However, the court found that although *Farnsworth* was not the requisite analysis, the factors of the *Farnsworth* analysis should be taken into account within the framework of a best interests analysis, and the court was still required to take into consideration the parents' reasons for seeking or opposing the move, the potential that the move holds for enhancing the quality of life for the child and custodial parent, and the impact the move will have on the child and noncustodial parent.

As to the motives of the parties, the trial court found that Elizabeth moved to Arizona with Samantha to live with her brother because she had reported Aaron to law enforcement after finding a picture of what she believed to be a young naked girl on his cell phone and due to his temper and aggressiveness. The court found that Aaron opposed the move because it would curtail his time with Samantha, but that the parties' motives favored the move to Arizona. The court further determined that the move to Arizona was not for better employment opportunities and that over the past year, Elizabeth had been working as a cashier for minimum wage without evidence of improvement, which factor weighed against the move. The court also found that both parties had large families and that while Samantha had a close relationship with Elizabeth's large family in Arizona, Samantha had little contact with Aaron's family, which weighed slightly against the move.

The court also engaged in a review of several other factors and found that the parties had both testified as to their family relationship and had given considerably different accounts. The court found that Elizabeth was the primary caregiver and provided for the majority of Samantha's needs and that Aaron helped, but was not the primary provider. The court found that Elizabeth had been taking care of Samantha with the help of family, but without much financial help from Aaron. The court found that because Samantha was very young, there was no evidence regarding her desires and wishes or of her general health, welfare, and social behavior. The court found that there was no credible evidence of child abuse, neglect, or domestic intimate partner abuse, but that Aaron had a temper and had acted out in a physical and aggressive manner which justified Elizabeth's concerns about leaving Aaron alone with Samantha.

The district court found that while there was no evidence concerning Elizabeth's moral fitness, there was evidence which called into question Aaron's moral fitness and did not reflect favorably thereon—such as pictures of a naked young girl and communications with young girls with sexual

innuendos—but that "[o]ther than Aaron's relationships with young girls, the evidence did not disclose any deficits in the attitude or stability of [either party's] character." The court found that Aaron lived alone and that Elizabeth and Samantha lived with her brother's family of eight in a four-bedroom home. The court further found that Samantha had not formed relationships because of her young age, and as such, the court was unable to conclude that any less-frequent contacts would be detrimental.

The court concluded that custody of Samantha with Elizabeth in Arizona, subject to visitation with Aaron, was in Samantha's best interests. The court ordered that due to Samantha's young age, if Aaron were to exercise any visitation with Samantha, it must be done in Arizona at Aaron's expense, citing evidence which rebutted the presumption of the application of the Nebraska Child Support Guidelines; it ordered a deviation of $75 per month for Aaron's travel expenses. The court ordered Aaron to pay $424 per month in child support. The court ordered Aaron to maintain health insurance for Samantha and ordered that after the first $480 of any calendar year's unreimbursed health care expenses for Samantha, for which Elizabeth was to be responsible, Aaron was to be responsible for 70 percent of any further such expenses and Elizabeth for 30 percent.

Specifically, as to Aaron's visitation, Aaron was awarded parenting time until Samantha was 5 years old on Christmas and during spring break in even-numbered years, on New Year's Day and during fall break in odd-numbered years, and for 1 continuous week of summer visitation. Once Samantha reached the age of 5, Aaron was awarded holiday parenting time in odd-numbered years during Easter, the Fourth of July, Thanksgiving, and New Year's Day and in even-numbered years during the Memorial Day weekend, the Labor Day weekend, Christmas, and Samantha's birthday. Furthermore, once Samantha reached the age of 5, Aaron was awarded visitation on Father's Day and Aaron's birthday and his summer visitation was extended to 6 continuous weeks. Aaron was also allowed to call and video chat with Samantha on

Sunday, Wednesday, and Friday of each week, for not less than 15 minutes.

Aaron filed a motion for new trial or, in the alternative, to alter and amend, which was denied by the district court. Aaron has timely appealed to this court.

## ASSIGNMENTS OF ERROR

Aaron assigns that the district court erred by awarding custody of Samantha to Elizabeth, by ordering a parenting plan that restricts his parenting time with Samantha, in failing to find that Elizabeth's flight to another state was a factor in determining custody and parenting time, in failing to find that Elizabeth intentionally alienated Samantha from Aaron, in not providing a sufficient deviation in the child support calculation for transportation costs, and in failing to allocate the income tax exemption for Samantha.

## STANDARD OF REVIEW

[1] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012).

[2] Parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. See *Rosloniec v. Rosloniec*, 18 Neb. App. 1, 773 N.W.2d 174 (2009).

[3] An award of a dependency exemption is reviewed de novo to determine whether the trial court abused its discretion. *Emery v. Moffett*, 269 Neb. 867, 697 N.W.2d 249 (2005).

[4] A judicial abuse of discretion exists when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Fitzgerald v. Fitzgerald*, 286 Neb. 96, 835 N.W.2d 44 (2013).

[5] When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Freeman v. Groskopf*, 286 Neb. 713, 838 N.W.2d 300 (2013).

## ANALYSIS

*Application of* Coleman
v. Kahler.

Both parties in this case focus on *Coleman v. Kahler*, 17 Neb. App. 518, 766 N.W.2d 142 (2009), which the district court relied upon in its order on the dissolution of the parties' marriage. The district court determined that the traditional removal analysis under *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), was not necessary in the custody determination at hand because there had been no prior custody order. Instead, the district court engaged in an analysis of the best interests of Samantha regarding placing custody with Elizabeth in line with the findings made in *Coleman*.

In *Coleman v. Kahler, supra*, a father and mother were in a relationship from which two children were born, but they were never married. Various orders regarding paternity and child support were entered, but no custody determinations were made, and the mother eventually moved with the children out of the state. *Id*. The trial court awarded custody of the parties' minor children to the mother, finding that it was in the best interests of the children to award the mother custody and to allow her to remove the children out of the state. *Id*. On appeal, the father asserted that the trial court erred in allowing the mother to remove the children and in denying his request for custody. *Id*. This court held that Nebraska's removal jurisprudence does not apply to a child born out of wedlock where there has been no prior adjudication addressing child custody or parenting time. *Id*.

Clearly, the facts of the present case differ from those of *Coleman v. Kahler, supra*, insofar as this case involves an original action for dissolution, as Aaron and Elizabeth had been married, and insofar as this was not a paternity action.

Therefore, the parties' focus and the district court's reliance on the findings of *Coleman* are misplaced. If the Nebraska court system were to allow litigants to mesh original custody determinations and removal determinations in such a way as has occurred in this case, it would allow parents to leave the state with children before any filing occurred and without any repercussions and would allow parents to avoid any scrutiny under a removal analysis. The trial court should have first entered an order regarding custody and then conducted a proper *Farnsworth* removal analysis, which would take into account an appropriate parenting plan in accordance with the custody determination and decision regarding removal and would also include a determination regarding child support and an award of the tax exemption. Cf. *Clinton M. v. Paula M.*, 21 Neb. App. 856, 844 N.W.2d 814 (2014), and *State on behalf of Savannah E. & Catilyn E. v. Kyle E.*, 21 Neb. App. 409, 838 N.W.2d 351 (2013) (in cases where noncustodial parent is seeking sole custody of minor child while simultaneously seeking to remove that child from jurisdiction, court should first consider whether material change in circumstances has occurred and, if so, whether change in custody is in child's best interests; if this burden is met, then court must make determination of whether removal from jurisdiction is appropriate).

Therefore, upon our de novo review of the record, the district court's and the parties' reliance upon *Coleman v. Kahler, supra*, was in error. We shall address the effect of this determination upon the district court's specific findings in turn.

*Custody.*

Aaron argues that the district court erred by awarding Elizabeth custody of Samantha subject to his rights of reasonable parenting time.

[6-8] The standard for determining custody is parental fitness and the child's best interests. See *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006). Nebraska's Parenting Act states that it is in the best interests of the child to have a "safe, stable, and nurturing environment." Neb. Rev. Stat. § 43-2921 (Reissue 2008). In determining the best interests of the child

in a custody determination, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the desires and wishes of the minor child if of an age of comprehension regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the general health, welfare, and social behavior of the minor child; and (4) credible evidence of abuse inflicted on any family or household member. Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and the parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004). When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Hajenga v. Hajenga*, 257 Neb. 841, 601 N.W.2d 528 (1999).

The record in this case indicates that Samantha was very young when Elizabeth left the home and that thus, there was not much evidence regarding the relationship of Samantha with each parent prior to the commencement of the action, other than testimony given that Elizabeth was the primary caregiver and that Aaron was involved with Samantha's care. This also affects consideration of the desires and wishes of the child, as Samantha is too young to speak, much less communicate her preference. The record indicates that Samantha was generally healthy, with the exception of being colicky as a newborn, and was progressing as expected. The record does not contain any credible evidence of abuse inflicted on any family or household member.

The record indicates that both parents could provide Samantha with a place to live and that both parents were fit and had the capacity to provide physical care and satisfy the educational needs of Samantha. However, the record indicates that Aaron had a temper and was easily frustrated in dealing

with Samantha's fussiness associated with her colicky condition. The record also indicates that Elizabeth was concerned with Aaron's moral fitness after finding a picture of a naked woman on his cell phone and social media Web site conversations with other women on his computer.

Based upon our de novo review of the evidence, we find that the district court did not abuse its discretion by awarding custody of Samantha to Elizabeth. Both parents are fit to parent Samantha, but because Elizabeth is the primary caregiver of Samantha, custody with Elizabeth is not an abuse of discretion. Therefore, we affirm that portion of the district court's order awarding custody of Samantha to Elizabeth.

*Removal.*

Aaron assigns that the district court erred by allowing Elizabeth to leave the state with Samantha. Aaron agrees with the district court that while the analysis set forth in *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999), does not "'technically'" apply, the factors of the *Farnsworth* analysis should be taken into consideration. Brief for appellant at 20.

[9] Once the district court has made the initial custody determination, it should not skip over the majority of the removal analysis if the parent has requested or, as in this case, has already left the state with the child. There is a two-step process before a custodial parent is allowed to remove a child from the State of Nebraska. The custodial parent must satisfy the court that there is a legitimate reason for leaving the state and that it is in the minor child's best interests to continue to live with that parent. See *id*.

[10] *Farnsworth* sets forth three broad considerations to consider whether removal is in the children's best interests: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the children and the custodial parent; and (3) the impact such a move will have on the contact between the children and the noncustodial parent, when viewed in the light of reasonable visitation. See *Wild v. Wild*, 15 Neb. App. 717, 737 N.W.2d 882 (2007).

[11] The purpose of requiring a legitimate reason is to prevent the custodial parent from relocating because of an ulterior motive, such as frustrating the noncustodial parent's visitation rights. See *Farnsworth v. Farnsworth, supra*.

In this case, there was ample evidence presented which would have allowed the district court first to analyze whether or not Elizabeth had a legitimate reason to leave the state and then, if necessary, to engage in an analysis of whether Elizabeth then demonstrated that removing Samantha from Nebraska was in her best interests. See *id*. However, the court did not properly do so in line with Nebraska Supreme Court precedent on removal. As such, we reverse the order of the district court allowing Elizabeth to remove Samantha from the State of Nebraska and remand the matter for a determination by the district court, on the record as it now exists, to determine whether Elizabeth has a legitimate reason to leave the state and then, if necessary, whether said removal is in Samantha's best interests.

*Parenting Plan and Child Support*.

Aaron argues that the district court abused its discretion in the parenting plan entered by failing to consider if the plan would foster a relationship between himself and Samantha, by entering a plan that is more accommodating to Elizabeth, and by awarding him inequitable parenting time with Samantha.

[12] Having reversed the district court's determination regarding removal and remanded that matter for a proper determination based upon the requirements set forth in *Farnsworth v. Farnsworth, supra*, we also reverse the district court's determinations on the parenting plan and child support order. We also remand those matters back to the district court for redetermination, mindful that a reasonable visitation arrangement should provide a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. See *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002).

*Tax Exemption*.

Aaron argues that the district court failed to award either party the tax exemption. However, upon our review of the

record, we find that the issue was not properly raised before the district court, either in the pleadings or at trial. Had the issue been raised at the trial court level, this court could address the issue on appeal, but it is well established that an issue not properly presented to and passed upon by the trial court may not be raised on appeal. See *Gebhardt v. Gebhardt*, 16 Neb. App. 565, 746 N.W.2d 707 (2008).

## CONCLUSION

In conclusion, based upon our de novo review of the record, we find that the district court's award of custody of Samantha to Elizabeth is in Samantha's best interests. We decline to address Aaron's assignment of error regarding the tax exemption because that matter was not properly presented to and passed upon by the trial court. However, we reverse the order of the district court allowing Elizabeth to leave the State of Nebraska with Samantha and remand the matter back to the district court for an appropriate retrial on the matter of removal based upon the record as it exists before this court. The district court's order regarding the parenting plan and child support is also reversed and the matter remanded to the district court for redetermination on the current record.

Affirmed in part, and in part reversed and remanded for further proceedings.